# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHERRILYNN GROSSO,        )
                                       )
             Plaintiff.        )
                                       )
             v.                )   Civil Action No. 10-0075
                                       )
                                     )
UPMC and BIOTRONICS, INC.,     )
                                     )
            Defendants.     )

## MEMORANDUM OPINION

**CONTI**, District Judge.

## I. INTRODUCTION

Pending before the court is a motion for summary judgment (ECF No. 37) filed by defendants University of Pittsburgh Medical Center ("UPMC") and Biotronics, Inc. ("Biotronics" and together with UPMC, "defendants") pursuant to Federal Rule of Civil Procedure 56 with respect to all claims asserted in the amended complaint (ECF No. 9) filed by plaintiff Sherrilynn Grosso ("Grosso" or "plaintiff"). The law suit arises from defendants' decision to terminate plaintiff's employment on August 8, 2008. Plaintiff asserted four counts against defendants, claiming that (1) defendants terminated her employment because of her disability, failed to make reasonable accommodations, and denied her subsequent employment in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112(a), (b)(5)(A) ("ADA"),[1] (Am. Compl. (ECF No. 9) ¶¶ 17-18); (2) defendants "interfered with, restrained, and

---

[1] Congress amended the ADA in 2008, effective January 1, 2009. ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ("ADAAA"). The parties agreed that the previous version of the ADA governs because Grosso's termination occurred five months before the ADAAA became effective. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n M.S.J.") (ECF No. 46) at 2 n.1; Mem. in Supp. Defs.' Mot. Summ. J. ("Defs.' M.S.J.") (ECF. No 40) at 7-8.) Furthermore, the United States Court of Appeals for the Third Circuit determined, albeit in an nonprecedential opinion, that the ADAAA does not retroactively apply. Britting v. Sec'y, Dep't of Veterans Affairs, 409 F. App'x 566, 569 & n.3 (3d Cir. 2011).

denied Grosso's exercise of her rights" under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2614(a) ("FMLA"), "by failing to fully inform her of her rights and obligations under the FMLA" and negatively considered FMLA qualifying work absences when making the decision to terminate her (Am. Compl. (ECF No. 9) ¶ 22 ); (3) defendants retaliated against her in violation of the FMLA, 29 U.S.C. § 2516(a)(2), because she took qualifying leave[2] (Am. Compl. (ECF No. 9) ¶ 28); and (4) defendants' discriminatory actions violated the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 955(a) ("PHRA") (id. ¶ 32).[3] Grosso is seeking reemployment in the position from which she was discharged, lost wages and benefits, and punitive damages. (Id. ¶¶ 20, 24, 30, 33.) She is also seeking reimbursement for the costs of litigation and that defendants be enjoined from discriminating against her in violation of the ADA, FMLA, and PHRA. (Id.)

This court exercises subject-matter jurisdiction over plaintiff's ADA and FMLA claims as federal questions under 28 U.S.C. § 1331 and has supplemental jurisdiction over plaintiff's PHRA claims pursuant to 28 U.S.C. § 1367. Pennsylvania courts interpret the PHRA under the same standards as the ADA and other analogous federal statutes. Salley v. Circuit City Stores, Inc., 160 F.3d 977, 979 n.1 (3d Cir. 1998) ("Although they are not bound to do so, Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, among them the ADA."); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). The Court of Appeals for the Third Circuit has stated that "[t]he PHRA is basically the same as the ADA" and allowed its disposition of an ADA claim to apply equally to a PHRA claim. Rinehimer v. Cemcolift, Inc., 292 F.2d 375, 382 (3d Cir. 2002). Therefore, the court will not consider the PHRA claims independently of the analogous federal claims.

---

[2] Plaintiff characterized Count II as a "Restoration to Position" claim under the FMLA (Am. Compl. (ECF No. 9) ¶ 21) and Count III as a "Discrimination/Retaliation" claim under the FMLA (id. ¶ 25). Both parties treat these as two separate claims: FMLA interference and FMLA retaliation. (Defs.' M.S.J. (ECF No. 40) at 23-25; Pl.'s Opp'n M.S.J. (ECF No. 46) at 26-28.)
[3] Plaintiff's amended complaint incorrectly labels the fourth count as "Count V." (See Am.Compl. (ECF No. 9).) For ease of reference, the court will refer to it in this memorandum opinion as "Count IV."

Because no reasonable jury would render a verdict in favor of plaintiff, defendants'
motion for summary judgment will be GRANTED.


II.    **FACTUAL BACKGROUND**

In 1986 Grosso was hired as a staff perfusionist by Shadyside Hospital, which was
eventually acquired by UPMC.  (Sherrilynn Grosso Dep. Tr. ("Pl.'s Dep.") (ECF No. 38-1) at
17.)  Eventually, she began providing perfusion services for Biotronics (id. at 17, 20-21) and
serviced other UPMC hospitals within the region (id. at 22-23).  Initially, Jack McEwen
("McEwen") was plaintiff's Biotronics' supervisor, but in 1995 or 1996, Steven Stewart
("Stewart"), the Director of Perfusion Services, became the supervisor. (Id. at 26-27.)  In 2002 or
2003, plaintiff stopped servicing some of the hospitals within UPMC's network and only worked
for Butler Memorial Hospital and North Hills Passavant Hospital, where lead perfusionist Lisa
Knauf ("Knauf"), who also reported to Stewart, was plaintiff's direct supervisor  (Id. at 24, 27.)

Grosso's primary task as a staff perfusionist was to run the cardiopulmonary bypass
machine, also called the heart-lung machine, (Donna Lucas, M.D. Dep. Tr. & Exs. ("Lucas'
Dep.") (ECF No. 38-6) at 15-16), which is used during open-heart surgery and sustains the life of
the patient (Ronald V. Pellegrini Dep. Tr. & Ex. ("Pellegrini's Dep.") (ECF No. 38-5) at 27). In
addition to running the machine and fully monitoring it while in use during surgery, the
perfusionist must have the machine ready to go prior to the patient being taken into the operating
room.  (Lucas' Dep. (ECF No. 38-6) at 15-16.) The bypass machine is used to circulate
artificially the patient's blood during surgery, and by operating it, a perfusionist maintains the
patient's blood pressure, oxygenation, and body temperature.  (Id.)  In addition, a perfusionist
administers an anti-coagulant into the patient's bloodstream (Pellegrini's Dep. (ECF No. 38-5) at

17-18) and monitors medications given during the course of an operation including anesthetics (id. at 15; Lucas' Dep. (ECF No. 38-6) at 15-16).  Plaintiff characterized the scope and duration of these responsibilities as only occurring while a patient is on the bypass machine, and not during the entire course of a surgery.  (Joint Statement of Material Facts- Defs.' Statement & Pl.'s Resps. ("J.S.F.-Defs.'") (ECF No. 55) ¶¶ 14-15.)  More specifically, putting a patient "on bypass" means that the patient's chest is opened and up and tubes are placed going into the heart. (Pellegrini's Dep. (ECF No. 38-5) at 17.)    The perfusionist administers the anti-coagulant to the bloodstream, and the blood is drained from the heart and lungs to the cardiopulmonary bypass machine.  (Id.)  The blood is pumped back into the patient through additional tubes, but it is shut off from the heart and lungs, enabling the surgeon to work on the heart.  (Id.)

Grosso is a Type I diabetic and also suffers from Hypoglycemic Unawareness Syndrome ("HUS").  (Pl.'s Dep. (ECF No. 38-1) at 41; Vijay Bahl, M.D. Dep. Tr. ("Bahl's Dep.") (ECF No. 38-7) at 10, 31.)  Type I diabetes is an auto-immune disease where the body fails to produce insulin, leaving a sufferer with high blood sugar levels.  (Bahl's Dep. (ECF No. 38-7) at 11-12.)  The disease is managed by taking insulin, either through a pump or outright injections.  (Id. at 12-14.)  Sometimes, however, the taking of insulin leads to hypoglycemia—a condition of low blood sugar, also known as the blood glucose level, which is often evidenced by lethargy and sometimes by disorientation. (Id. at 21, 24.)  Typically when a person's blood sugar level is dropping, the body produces adrenaline, causing outward symptoms such as sweating, palpitations, and tremors.  (Id. at 29.)  These symptoms often appear at the onset of diabetes, but over time, the body produces less adrenaline, causing the symptoms eventually to lessen and disappear.  (Id.)  After time, the body begins to produce no warning signals to indicate low blood sugar levels, which ultimately may result in HUS; HUS prevents a diabetic from knowing that he

or she is experiencing low blood glucose levels.  (<u>Id.</u> at 29-30.)  HUS may also develop in a person who has wide fluctuations in blood glucose levels because keeping track of the levels may become too difficult.  (<u>Id.</u> at 30.)  A person with HUS can pass out without any warning signs whatsoever.  (<u>Id.</u> at 31.)

In order to cope with HUS, plaintiff wears a sensor that alarms her when her blood sugar is too low.  (Pl.'s Dep. (ECF No. 38-1) at 103.)  Plaintiff began wearing the sensor in October 2009.  (<u>Id.</u> at 104.)[4]  During her deposition, Grosso estimated that since 2008 she has had thirty to thirty-five incidents where she goes from feeling fine to becoming suddenly disoriented.  (<u>Id.</u> at 106.)  Plaintiff admitted that this kind of incident happens "at least once a month."  (<u>Id.</u>)  Grosso stated that she has passed out nine times in her life and estimated six to seven of those times occurred since January 2008.  (<u>Id.</u> at 106.)  Grosso declared in a subsequent affidavit that the instances where she "lost consciousness," or passed out, were caused by unique circumstances including skipping meals or staying up throughout the night; she stated that once she identifies a triggering circumstance, she tries to avoid it.  (Aff. of Sherrilynn Grosso Ex. 16 ("Pl.'s Aff. Ex. 16") (ECF No.49-32) ¶ 28.)

The parties are in dispute over the severity of plaintiff's HUS and whether plaintiff does in fact know when she is having, or about to have, a hypoglycemic episode.  (Reply Br. Supp. Defs.' Mot. Summ. J. ("Reply Br.- Defs.'" (ECF No. 53) at 3.)[5]  According to plaintiff's expert

---

[4] Up until that time, plaintiff's health insurance would not cover the costs of the sensor.  (Pl.'s Dep. (ECF No. 38-1) at 104.)  The record contains no information about the sensor such as explaining how it alarms her or if because of using it, she can now predict when a hypoglycemic incident will occur.  Furthermore, there is nothing in her doctor's deposition that mentions a sensor.  (<u>See</u> Bahl's Dep. (ECF No. 38-7).)

[5] Defendants argue that plaintiff's deposition testimony and her brief in opposition to summary judgment and affidavit conflict, resulting in a sham affidavit.  (Reply Br. in Supp. of Defs.' Mot. for Summ. J. ("Reply Br.-Defs.'" (ECF No. 53) at 2.)  Under the "sham affidavit" doctrine, district courts "'disregard[] an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'"  <u>Seitz v. Detweiler, Hershey and Assocs., P.C.</u> (<u>In re CitX Corp.</u>), 448 F.3d 672, 679 (3d Cir. 2006) (quoting <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004)); <u>see, e.g.</u>, <u>Jiminez v. All Am. Rathskeller, Inc.</u>, 503 F.3d 247, 252 (3d Cir. 2007) (holding that to permit the plaintiffs to engineer factual disputes by means of self-

doctor, Dr. Vijay Bahl, her HUS prevents her from predicting or sensing when she is going to

pass out. (Bahl's Dep. (ECF No. 38-7) at 31.) In her deposition testimony, plaintiff answered

that before wearing her sensor, she had no way to predict when she would have a serious

hypoglycemic episode where her mere disorientation would quickly escalate to unconsciousness.

(Pl.'s Dep. (ECF No. 38-1) at 106-07.) Grosso, however, noted the following in a subsequent

affidavit:

---

serving affidavits "'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact'" (quoting Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969)); Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231, 2008 U.S. Dist. LEXIS 70026, at *4 (W.D. Pa. Feb. 4, 2008) (second report and recommendation) (granting summary judgment based on employee's "performance evaluations . . . , her contemporaneous reporting of her job responsibilities, [her] resume, and her deposition testimony"), adopted by Memorandum Opinion, Zalewski v. PNC Fin. Servs. Group, Inc., No. 06-1231 (W.D. Pa. Apr. 7, 2008), ECF No. 52.

"A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." Jiminez, 503 F.3d at 253. Because the trial court is vested with the inherent power to grant summary judgment on disputed records, Anderson v. Liberty Lobby, 477 U.S. 242, 251 (1986), the court may conclude that no reasonable jury could accord evidentiary weight to an affidavit that is clearly offered solely for the purpose of defeating summary judgment. Jiminez, 503 F.3d at 253. The practical underpinning of the sham affidavit doctrine "is that prior depositions are more reliable that affidavits." Id.

In Jiminez, the Court of Appeals for the Third Circuit recognized that other courts of appeals have "adopted a particularly robust version of the sham affidavit doctrine, holding that, whenever a subsequent affidavit contradicts prior deposition testimony, it should be disregarded." Id. at 254. The Court of Appeals for the Third Circuit has "adopted a more flexible approach." Id. The court recognized in Jiminez that "not all contradictory affidavits are necessarily shams." Id. Notably, "'[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." Id. (quoting Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004)). "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition," and the affiant should have the opportunity to provide a "satisfactory explanation" for the conflict between the prior deposition and the affidavit. Id.; see Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988) ("When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact.").

When deposition testimony is ambiguous or incomplete, subsequent affidavits may be provided to clarify the testimony and will not be discarded as sham documents. See Lytle v. Capital Area Intermediate Unit, No.1:05-CV-0133, 2009 WL 82483, at *2 (M.D. Pa. Jan. 9, 2009) ("Situations may arise where an affidavit does not 'raise a new or distinct matter,' but rather explains certain aspects of a deposition testimony that caused confusion." (quoting Baer, 392 F.3d at 625)). To that end, "[d]isregarding statements in an affidavit is appropriate on 'clear and extreme facts' . . . when the affidavit is 'flatly contradictory' to the prior testimony . . . ." Coleman v. Cerski, No. 3:04-cv-1423, 2007 WL 2908266, at *5 (M.D. Pa. Oct. 4, 2007) (quoting Videon Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993)). When allegations in a subsequent affidavit could support statements made in prior deposition testimony, the dueling statements "are more appropriately dealt with on cross-examination than on summary judgment." Ragan v. Fuentes, No. 05-2825, 2007 WL 2892948, at *11 (D.N.J. Sept. 28, 2007).

The court need not consider the sham affidavit argument raised by defendants, because the court concluded that no reasonable jury could find in favor of plaintiff, even upon consideration of the evidence presented in the allegedly sham affidavits.

The Hypoglycemic Unawareness Syndrome does not typically prevent me from knowing that I am hypoglycemic; it just prevents me from realizing it right away. Most times during a hypoglycemic episode, I am able to quickly self-treat and correct my glucose level easily by obtaining nourishment. It is only at those rare times when I am unable to self-treat that my glucose level drops to a dangerously low level (at 40 mpd) and I can become unconscious.

(Pl.'s Aff. Ex. 16 (ECF No. 49-32) ¶ 19.) Defendants consider these statements irreconcilable with plaintiff's definition of HUS: "You are unaware that you are hypoglycemic." (Pl.'s Dep. (ECF No. 38-1) at 57.) Grosso responded to the deposition question of whether Knauf was familiar with plaintiff's hypoglycemic symptoms by stating: "Well, when I don't even know I am low glucose, I don't think she would know. I mean, I have no outward sign."[6] (Id. at 51.)

In addition to wearing an insulin pump and counting carbohydrates when she eats (Pl.'s Dep. (ECF No. 38-1) at 41-42), plaintiff is careful to check her blood glucose levels six to eight times per day (id. at 43). Grosso requested some work accommodations from defendants in order to help her self treat; generally, she is allowed to take breaks to eat, to have another person get her something to eat (id. at 63-64), and to take food from the intensive-care unit patient refrigerator (id. at 98).[7]

Dr. Ronald Pellegrini ("Pellegrini"), a cardiothoracic surgeon with whom plaintiff worked, stated that a perfusionist who could become unconscious poses serious risks to the patient.[8] (Pellegrini's Dep. (ECF No. 38-5) at 54.) If a perfusionist were to become unconscious while monitoring the patient and running the bypass machine, the patient could face irreversible

---

[6] Grosso argues in her surreply brief that she knows when she is having a hypoglycemic episode and can self treat. (Pl.'s Sur Reply to Defs.' Reply Br. Supp. Defs.' Mot. Summ. J. ("Pl.'s Sur Reply" (ECF No. 56) at 4.) Her counsel asserts that defendants incorrectly construed her statements as a "blanket conclusion" to mean that a person with HUS is "never aware that he or she is hypoglycemic." (Id. at 6.) In the surreply, plaintiff attempted to distinguish between being able to "predict" an episode versus being aware of "experiencing" an episode. (Id. at 4.) Grosso contended that "she is generally able to sense when she is experiencing a hypoglycemic episode and can self treat her disability." (Id.)

[7] By reason of plaintiff's medical condition, she was allowed to take food from the ICU refrigerator, which is for the patients; other employees did not have permission do so. (Pl.'s Dep. (ECF No. 38-1) at 98.)

injury or death.  (Id.)  According to Pellegrini, this could happen if the perfusionist administers too much or too little medications, allows the anticoagulation level to get too high, or inadvertently pumps air into the patient by letting the blood reservoir in the machine get too low. (Id.)[9]  Pellegrini stated at his deposition his opinion that Grosso "poses a risk to any patient that she tries to manage with a heart-lung machine."  (Id. at 60.)  He stated:

> I wouldn't—under no circumstances, none, would I ever have her run the pump with me doing a case with this medical problem.  I think it's—it would be malpractice on my part to allow that to occur.  Even if she had a second in command sitting right beside her, I think it would be—I would be derelict in my responsibility to the patient to allow her to do that.

(Id. at 37.)

On July 23, 2008, in an effort to lose weight, plaintiff elected to have laparoscopic band surgery and was on a clear liquid diet from the day of her surgery until August 1, 2008.  (Pl.'s Dep. (ECF No. 38-1) at 123, 127.)  The diet made plaintiff prone to low blood sugar levels and increased her difficulty in maintaining normal blood glucose levels, but Grosso used vacation days after the surgery to recuperate and to make sure she could maintain her blood sugar levels. (Id. at 123-25.)  Plaintiff began working again on July 28, 2008.  (Id. at 123.)  On July 28, 2008, Grosso had a conversation Knauf about plaintiff's surgery and diet.  During that conversation, Knauf asked if plaintiff was able to work.  (Id. at 127-28; Lisa Marie Knauf Dep. Tr. ("Knauf's Dep.") (ECF No. 38-1) at 28-29.)  Plaintiff responded by indicating that she could work, but would need help moving the machine.  (Pl's Dep. (ECF No. 38-1) at 127-28; Knauf's Dep. (ECF No. 38-9) at 28-29.)

---

[8] Pellegrini conducted over 15,000 open-heart surgeries in his career and has forty-one years of experience. (Pellegrini's Dep. (ECF No. 38-5) at 52.)
[9] Pellegrini stated that one of his patients bled to death because the patient was administered too much anti-coagulant.  (Pellegrini's Dep. (ECF No. 38-5) at 55.)

On the morning of July 31, 2008, Grosso reported to work and immediately went into the operating room to begin setting up the bypass machine. (Pl.'s Dep. (ECF No. 38-1) at 66-67.) When she set up the bypass machine, plaintiff was not preparing to use it immediately; the surgery was several hours later. (Id. at 68, 74-76.) During set up, plaintiff checked her blood sugar and had low glucose levels. She did not report her glucose levels to any superiors; she instead took glucose tablets and turned down her insulin pump. (Id. at 16, 49, 67.)[10] Grosso helped prepare the patient for surgery (id. at 68), while Dr. Donna Lucas, the anesthesiologist ("Lucas"), and a few others were present in the operating room (id. at 68-69).

Around 7:30 a.m., Grosso took a break because that was the usual time the backup, or second, perfusionist would come to the operating room to assist. (Knauf's Dep. (ECF No. 38-9) at 25.) Knauf was serving as the backup perfusionist on July 31, 2008, and entered the operating room at the time plaintiff was taking her break. (Id.) Plaintiff returned at approximately 8 a.m., and the surgery started. (Id.) Knauf left the operating room and went to her office to take care of some administrative responsibilities, but she returned in less than thirty minutes. (Id.) According to Knauf, aside from being the backup perfusionist for July 31, 2008, she stayed with Grosso during some of the procedure because of the type of procedure and risks involved. (Id.)

> Since it was a redo procedure, I stayed in the room with Sherri. Lots of times for a reentry heart you can nick something or cut something, and things start to move along a little bit fast. So, it's nice to have another person in the room with you. And we all do that for each other.

(Id.)

During the surgery, but before initiating the bypass, Grosso was sitting behind the surgeon, Pellegrini, with her feet elevated on a stool and was wrapped up in a blanket; she also propped her head up by leaning her arm against the equipment and her head on her arm and

---

[10] Plaintiff disputes any inference of wrongdoing on her part by not reporting her low blood glucose level. (J.S.F.-

hands.  (Id. at 71-72.)[11]  While reclined in that manner, plaintiff was waiting for the surgeon's

order to put the patient on the bypass machine; the patient was not yet on bypass though the

surgery had started.  (Id. at 70-71.)  While waiting, plaintiff remembers saying to her co-workers

"alls [*sic*] we need are pillows."  (Id. at 73.)  Knauf, who was in the pump room at that time,

which is adjacent to the operating room, said she saw plaintiff through the operating room

window wrapped up in the blanket and thought she was sleeping.[12]  (Knauf's Dep. (ECF No. 38-

9) at 25-26; see also Lucas' Dep. (ECF No. 38-6) at 13, 21.)   Plaintiff remembers Knauf coming

in and saying "Go.  You need to get out of here, go walk around."  (Pl.'s Dep. (ECF No. 38-1) at

73.)[13]  Grosso does not remember what happened after that statement was made and testified that

she was not in a "full state of consciousness" (id. at 189) and did not remember what had

specifically happened (id. at 73.)

Following this incident, Grosso left the operating room and unknown to Knauf (Knauf's

Dep. (ECF No. 38-9) at 26), had coffee, popsicles, and milk; she did not check her blood sugar

(Pl.'s Dep. (ECF No. 38-1) at 79-80).[14]  Once she returned to the operating room, plaintiff began

operating the bypass machine, and Pellegrini instructed her to turn off the "vent."  Grosso

immediately repeated back "Okay.  Vent's up," which is what she thought were his instructions.

---

Defs.' (ECF No. 55) ¶ 52.)
[11] Due to low temperatures in the operating room, plaintiff often used a blanket while working.  (Pl.'s Dep. (ECF No. 38-1) at 71-72; Knauf 's Dep. (ECF No. 38-9) at 56-57.)  Knauf, however, stated that on July 31, 2008, plaintiff was not using the blanket while actually operating the bypass machine.  (Knauf's Dep. (ECF No. 38-9) at 56-57.)
[12] Plaintiff disputes any inference that she was attempting to sleep or had a pillow and contends that she was suffering from a low blood sugar level at the time.  (J.F.S.- Defs.' (ECF No. 55) ¶ 62.)  Lucas stated that she observed the plaintiff leaning against the machine, wrapped up in a blanket, and that she did in fact have a pillow.  Lucas, however, never recorded those observations in her statement.  (Lucas' Dep. (ECF No. 38-6) at 21-22, 27-28.)
[13] Plaintiff does not dispute that this is what happened; she, however, does dispute any inference that she was sleeping and claims she had low blood sugar at the time.  (J.F.S.- Defs.' (ECF No. 55) ¶ 65.)  The record reveals that Knauf testified that she saw plaintiff and thought she was sleeping and approached Grosso and said the following: "Sherri, you cannot be sleeping here.  You need to leave the OR and wake yourself up."  (Knauf 's Dep. (ECF No. 38-9) at 26.)  Knauf said plaintiff left and came back, appearing to be fine and then the patient was put on the bypass machine.  (Id.)

Pellegrini repeated his instructions and plaintiff said: "Okay. It was. It was. I'm turning the vent off." (Id. at 82.) Because the operating room is filled with noise from machines, Grosso's habit was to repeat the surgeon's instructions to ensure she correctly heard them. (Id.)

In addition to the incident described above, the record reveals a second incident.[15] While the patient was on bypass and Knauf briefly moved from the operating room to the pump room, Lucas went to get Knauf because Lucas was concerned; Lucas told Knauf that Grosso looked "sleepy and lethargic." (Knauf's Dep. (ECF No. 38-9) at 26-27.)[16] Knauf said that plaintiff asked if Lucas had sent Knauf back into the operating room; Knauf said "yes" and asked Grosso how she was doing. (Id. at 27.) According to Knauf's deposition, Grosso replied "Yeah, I'm fine. This is just a long case." (Id.) After remaining to observe plaintiff and asking if she needed lunch, to which the plaintiff said "no", Knauf found plaintiff's performance satisfactory and stated that plaintiff seemed fine. (Id.) Grosso's version of this incident slightly differs. Grosso testified that right after she incorrectly repeated Pellegrini's orders regarding the vent, Lucas "went flying into the pump room." (Pl.'s Dep. (ECF No. 38-1) at 82.) Lucas and Knauf exited the pump room and approached her, asking if she was feeling alright. (Id.) The deposition testimonies of Lucas and Knauf did not reflect that this situation occurred immediately following plaintiff's apparent mistake regarding the vent instructions.

Following the surgery, Knauf met with Grosso and informed her that Lucas was going to write her up for sleeping while a patient was on bypass. (Id. at 85.) Plaintiff told Knauf that she was not sleeping while the patient was on bypass and that Knauf was using the first incident,

---

[14] Plaintiff disputes that checking her blood sugar was necessary at the time and asserts that her actions were a typical way she regulated her blood sugar levels. (J.F.S.- Defs.' (ECF No. 55) ¶ 67 (citing Pl.'s Dep. (ECF No. 38-1) at 48-49; Bahl's Dep. (ECF No. 38-7) at 26-27).)

[15] In the parties' various briefs, statements of the facts, and the joint statement of facts, the parties refer to the two distinguishable moments on the same day in which Gross appeared to be lethargic or sleeping as a single incident The court considers the two instances separate incidents, as one occurred before the bypass machine was in use, and the other occurred during its use. (Pl.'s Dep. (ECF No. 38) at 70-71; Knauf's Dep. (ECF No. 38-9) at 26-27.)

which occurred during the surgery, but before use of the bypass machine, to support the contention that plaintiff was sleeping while the patient was on bypass. (Id. at 86-87.) Grosso told Knauf that she had low blood sugar earlier in the day, and Knauf instructed plaintiff to write down her "side of the story." (Id. at 87-88.) According to plaintiff, all her supervisors and the perfusionists with whom she worked were aware that she was diabetic. (Id. at 49.)

During the meeting, Grosso elaborated about the effects of the laparoscopic band surgery that she had on July 23, 2008. (Id. at 87-88.) Grosso explained to Knauf her belief that the combination of the band surgery and her diet caused her to experience low blood glucose levels and a hypoglycemic episode during the surgery on July 31, 2008. (Id.) According to plaintiff, she even had a low glucose attack during that meeting, and Knauf, at one point, stepped out of the room to get her something to drink. (Id. at 87.) Because Knauf knew Grosso was diabetic and had witnessed her on prior occasions with low blood glucose levels,[17] Knauf asked plaintiff during the meeting if plaintiff felt low glucose that day. (Knauf's Dep. (ECF No. 38-9) at 9.)

After plaintiff returned home from work on July 31, 2008, she wrote her statement regarding the day's events, describing the operating room on that day as being "eerily quiet and warm" and said she "rested [her] eyes, intermittently." (ECF No. 38-2 at 22.) Grosso submitted a second statement to more accurately portray what had happened. She omitted the "quiet and warm" description and instead added information regarding her diabetes and stated that she "could have been a little low glucose." (Id. at 24.) Plaintiff admitted that the "quiet and warm" description was inaccurate, but said that in telling her to write a statement, Knauf commented

---

[16] Lucas said she saw plaintiff's head bobbing. (Lucas' Dep. (ECF No. 38-6) at 33.)
[17] Knauf said that she had seen plaintiff with a low glucose level several times and was always concerned about that happening while plaintiff was working. (Knauf's Dep. (ECF No. 38-9) at 32.) One time, Knauf found Grosso asleep on a bench in the locker room; while shaking the plaintiff in an effort to wake her, Grosso, disoriented, attempted to push Knauf away. In the end, Knauf was able revive plaintiff by giving her orange juice. (Id. at 32-33.)

that "if it was warm, say it was warm" and said the same thing about it being quiet. (Pl.'s Dep. (ECF No. 38-1) at 91-92.) Grosso testified that she only rested her eyes prior to the patient going on bypass, but not during bypass. (Id. at 96.)

On August 4, 2008, after receiving materials reporting the incident, Kathryn Shirk, who worked at UPMC as a human resources employee (Dep. of Kathryn Shirk ("Shirk's Dep.") (ECF No. 38-11) at 9-10), met with Knauf to discuss what had happened. (Id. at 98.) Shirk was in possession of written statements from three witnesses present in the operating room on July 31, 2008, indicating that plaintiff had appeared to be asleep. (Id. at 96.) Under UPMC policy, the recommendation given for employees who are either sleeping on the job or appear to be sleeping is termination of employment. (Id. at 53.) According to Shirk, this recommendation is given only after an investigation takes place and it is determined that the employee was either sleeping on the job or appeared to be sleeping on the job. (Id. at 54.)[18] Shirk recommended that Grosso be terminated for appearing to sleep on the job and based this recommendation on Grosso's statement about propping her feet up and resting her eyes. (Id. at 175.) When asked why she recommended the termination, Shirk stated the following:

> I recommended termination for Sherri Grosso because, based on her statement, she admitted to propping her feet up on some type of equipment, resting her eyes intermittently. She did not put forth any reason during that investigation of checking her glucose, telling her manager that she had any issues. It was based on the fact that she admitted to resting her eyes and giving the appearance for sleeping on the job.

(Id. at 175-76.)

Plaintiff was terminated on August 8, 2008, just over a week after the incidents, for "giving the appearance of sleeping on the job." (Pl.'s Dep. (ECF No. 38-1) at 129-30.) McEwen, Knauf, and Shirk were at the termination meeting. (Id. at 130.) McEwen was

handling the termination meeting because Stewart, plaintiff's direct supervisor, was on vacation. (McEwen's Dep. (ECF No. 38-10) at 48.) According to McEwen, Stewart and Shirk had already determined that plaintiff should be terminated, and although he disagreed with them, he went along with the decision because the investigation had ended. (Id. at 52.) He was troubled by having to the fire plaintiff. (Id. at 51-52.)[19] He disagreed with the decision because he had not been involved in the situation and did not work at Passavant; he also implied that he prefers to give people second chances for messing up on the job.[20] (Id.) McEwen was unaware whether Grosso had tried to explain to UPMC management that she had low glucose or possibly was unconscious during the July 31, 2008 incidents. (Id. at 54-55.) No one ever talked to McEwen about plaintiff's claim of having low blood glucose levels on that day. (Id. at 40.)

Although Stewart was not present for the termination meeting, Stewart communicated with Shirk via email during the decision-making process. When Shirk asked Stewart, by email, if he knew about plaintiff's diabetic condition, his response stated "[y]es, we've known this for years, and frankly, that's why we've put up with her shenanigans over the years." (ECF No. 38-

---

[18] Plaintiff pointed out that the record fails to show that defendant UPMC ever terminated someone for sleeping on the job or appearing to sleep on the job. (J.S.F. – Defs.' (ECF No. 55) ¶ 88.)

[19] On the morning of plaintiff's termination meeting, Knauf and McEwen exchanged email communications. McEwen requested that Knauf meet him in the lobby because he "didn't sleep a wink last night," and Knauf replied "[m]e neither." (McEwen's Dep. (ECF No. 38-10) at 51 (quoting ECF No. 38-12 at 50).) During his deposition, McEwen said he was bothered by having to terminate someone with whom he had worked for several years. (Id.)

[20] McEwen's reason for disagreeing with the decision was:

> It's just how I conduct things. How I do business is that people make mistakes, and sometimes you try to work with them so that you can correct them, and sometimes it works. Sometimes, it doesn't. The fact of the matter is is [*sic*] that it was a—it was a policy that was broken. The investigation was concluded. It was determined by Steve who was over Passavant and Katie that termination was the course of action. And since Steve had to work with Passavant and the physicians up there, we went with that.

(Id. at 52.)

13 at 12.) He stated that Grosso "always used her diabetes as an excuse" and noted that defendants "have had problems with [Grosso] for as long as she has been employed."[21] (Id.)

After being terminated, Grosso followed UPMC's procedures and filed an internal grievance regarding her termination with Lisa Sackett, the Human Resources Manager at UPMC Corporate. (Pl.'s Dep. (ECF No. 38-1) at 136-37; ECF No. 38-2 at 35-36; Lisa Sackett Dep. Tr. ("Sackett's Dep.") (ECF No. 38-14) at 14-15.) Plaintiff's grievance was handled by Celeste Rhodes, a human resources generalist at UPMC, who met with plaintiff for a couple hours on August 21, 2008. (Celeste Rhodes Dep. Tr. ("Rhodes' Dep.") (ECF No. 38-15) at 29.) During this meeting, Grosso felt as though Rhodes genuinely considered her side of the story. (Pl.'s Dep. (ECF No. 38-1) at 142.) According to Rhodes, Grosso mentioned her surgery and that she was, at the time, "trying to adjust to new insulin levels." (Rhodes' Dep. (ECF No. 38-15) at 30.) Rhodes did not remember discussing what type of surgery plaintiff had and admitted that she assumed plaintiff's comment about regulating insulin levels meant that plaintiff is diabetic and takes insulin. (Id.) Rhodes also admitted to not looking into the effects of Grosso's low blood sugar. (Id. at 32.) Although Rhodes was aware of plaintiff's diet following her surgery, Rhodes did not inquire into the effects of her diet. (Id.) On September 4, 2008, Rhodes denied plaintiff's grievance and upheld her termination (ECF No. 38-2 at 44; ECF No. 38-13 at 29, 33-

---

[21] In Stewart's email response to Shirk, he, among other things, stated:

> She has a real problem with authority—I used to think it just [*sic*] anti-male sentiment, but Lisa has had problems with her, as well. She has never, as far as I know, applied for any assistance, insisting there is nothing is [*sic*] wrong with her, except when she needs an excuse, such as this particular incident . . .
>
> If she, indeed, insists that this is a result of her condition, then can we force her into some type of disability? Whether or not there is an underlying condition, she cannot perform as a perfusionist if she sleeps on the job.

(ECF No. 38-13 at 12.)

34.)  Plaintiff was informed that she had seven days to file an appeal, but she never did so.  (Pl.'s Dep. (ECF No. 38-1) at 149.)

In addition to Grosso's contentions that she was fired for discrimination, Grosso testified that she was terminated because she "needed to use FMLA."  (Pl.'s Dep. (ECF No. 38-1) at 109.)  The issues surrounding the FMLA claim are difficult to follow because Grosso submitted an amended complaint correcting her original complaint with respect to the FMLA claims.  (J.S.F-Defs.' (ECF No. 55) ¶ 106.)  During Grosso's deposition, she admitted to never having requested or taken FMLA leave.  (Id. at 116.)  In Grosso's amended complaint, however, she asserted that defendants used her "absences from work for FMLA qualifying leave as a negative factor" in their decision making.  (Am. Compl. (ECF No. 9) ¶ 22.)  When questioned about what "absences" she was referring to, Grosso answered that these absences were "[w]hen I was hypoglycemic in the operating room."  (Pl.'s Dep. (ECF No. 38-1) at 116.)  Plaintiff and her attorney clarified that "Grosso's claims under the FMLA do not relate to her [laparoscopic band] surgery but are based on the July 31, 2008 incident during which she was unable to perform her job without reasonable accommodations."  (Pl.'s Opp'n M.S.J. (ECF No. 46) at 26.)

Plaintiff was questioned about allegations in her amended complaint in which she contended that she "took FMLA leave because of her own serious health condition" (Am. Compl. (ECF No. 9) at ¶ 26), "took FMLA qualifying leave" (id. ¶ 27), and "took leave protected by FMLA" (id. at ¶ 28).  During her deposition, Grosso admitted that these allegations were incorrect, on their face (Pl.'s Dep. (ECF No. 38-1) at 119-23), and that she took no FMLA leave on July 31, 2008 (id. at 120).


### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides in relevant part:

**(a) Motion for Summary Judgment or Partial Summary Judgment.**

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> . . . .

**(c) Procedures.**

> **(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56.

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) (citing Anderson, 477 U.S. at 248–52); Celotex Corp., 477 U.S. at 322–26) ("A genuine issue is present

when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.").  The Supreme Court held in <u>Celotex Corp.</u> that:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file."  Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and <u>Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings</u> and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

<u>Celotex Corp.</u>, 477 U.S. at 324 (emphasis added).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative,  summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).  The United States Supreme Court later emphasized:

> [W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party.  <u>Woodside v. Sch. Dist. of Philadelphia Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001); <u>Doe v. Cnty. of Ctr.</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage.  <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## IV. DISCUSSION

### A.  ADA Claim

The purpose of the ADA is to eliminate discrimination against qualified individuals with disabilities.  42 U.S.C. § 12101(b)(1).  Those with disabilities face discrimination in various areas of life including employment, housing, transportation, and health services.  Id. § 12101(a)(3), (5).  Under § 12112(a), "covered entit[ies]" are prohibited from discriminating against disabled persons in hiring, termination, compensation, advancement, training, and "other terms, conditions, and privileges of employment." Id. § 12112(a). Covered entities include employment agencies, labor organizations, and employers with at least fifteen employees.  Id. § 12111(2), (A).  The Congressional intent behind the 2008 Amendments to the ADA, the ADAAA, was to broaden the range of individuals protected by the statute, by retooling the definition of disabled.   S. Res. 3406, 110th Cong. § 2(a)(1) (2007) (enacted).  The matter at hand, however, must be analyzed under the ADA as it existed before the 2008 amendments because Grosso's termination occurred prior to 2009, the effective date of the ADAAA.  See ADAAA of 2008, Pub. L. No. 110-325, 122 Stat. 3553; Britting, 409 F. App'x 566 at 569 & n.3.[22]

Because Grosso claimed that defendants' proffered reason for terminating her is a pretext for disability discrimination, based on circumstantial evidence, the McDonnell-Douglas burden-shifting framework must be employed.  See Snyder v. Norfolk S. Ry. Corp., 463 F. Supp. 2d 528, 534 (E.D. Pa. 2006) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)); see also Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 65, 69 (3d Cir. 1996) (noting that the Court of Appeals for the Third Circuit has adopted the McDonnell-Douglas burden-shifting framework for age discrimination cases brought under pretext theory and that the

framework can be used in ADA cases).[23]  In order to establish a prima facie case under this framework, plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) with or without reasonable accommodations, she is "otherwise qualified to perform the essential functions" of her job; and (3) as a result of the discrimination, she suffered an adverse employment decision.  See Sulima v. Tobyhanna Army Dept., 602 F.3d 177, 185 (3d Cir. 2010) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)); Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998).  If plaintiff satisfies these elements, defendants must state a legitimate nondiscriminatory reason for the adverse employment actions.  Lawrence, 98 F.3d at 66.  If defendants do so, to survive summary judgment, plaintiff must show by a preponderance of the evidence that defendants' proffered reason was in fact a pretext for discrimination.  Id. (citing Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995)); Cook v. Brooks Sports, Inc., No. 07-172, 2009 WL 331551, at *4 (W.D. Pa. Feb. 11, 2009).

    1.  Disability within the Meaning of the ADA

    Under the pre-2009 ADA, disability with respect to an individual is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).[24]  Because the case law varies with respect to diabetic conditions being an ADA disability, the parties agreed for the purposes of this motion for summary judgment that Grosso having Type I Diabetes and HUS qualifies her as a person with a disability under the ADA.

---

[22] See also supra note 1.

[23] Plaintiff's PHRA claim will be decided using the same framework as the ADA claims because courts apply the PHRA under the same rules as the ADA.  See Rinehimer v. Cemcolift, Inc., 292 F.2d 375, 382 (3d Cir. 2002) (stating that "[t]he PHRA is basically the same as the ADA"); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

A plaintiff trying to prove that his or her disability comes within the meaning of the pre-2009 ADA must establish that he or she has an impairment and that the impairment substantially limits a major life activity. Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 382 (3d Cir. 2004). At a hearing held on December 15, 2011, defendants conceded for the purposes of this motion for summary judgment that Grosso does have an impairment. (Defs.' M.S.J. (ECF No. 40) at 8.) An impairment is "[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1) (2008).[25] Defendants had originally argued that plaintiff failed to show that her impairment substantially limited any major life activity. (Defs.' M.S.J. (ECF No. 40) at 8.)

"[F]unctions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working" constitute major life activities. 29 C.F.R. § 1630.2(I) (2008). The regulations generally define "substantially limits" as being "unable to perform a major life activity that the average person in the general population can perform." Id. § 1630(j)(1)(I). The term is further explained as being "significantly restricted" in the manner or duration of performing a major life activity than an average person. Id. § 1630(j)(ii). With respect to working, "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Id. § 1630(j)(3)(I). In interpreting these terms under the pre-2009 ADA, the United States Supreme Court has held that

---

[24] The ADAAA expands subsection (C), the "regarded as having such an impairment" prong, in order to broaden those protected. Under the amendment, the claimant no longer must show that his or her impairment does in fact limit a major life activity. See 42 U.S.C. § 12102(3)(A) (2009) (defining subjection (C)).

corrective measures taken to cope with the impairment must be considered in determining "whether that person is 'substantially' limited in a major life activity and thus 'disabled' under the Act." Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999).[26] An individualized, fact-sensitive assessment is required for determining whether a person is disabled under the ADA. Id. at 482-84.[27]

Defendants first noted that plaintiff failed to allege any major life activity and that failure to do so "is fatal to Plaintiff's claim." (Defs.' M.S.J. Br. (ECF No. 40) at 9 (citing Cruz v. Northwest Airlines, Inc., Civ. A. 01-cv-2167, 2002 WL 376899 (E.D. Pa. Mar. 5, 2002).) Defendants attacked the record for plaintiff's failure to show she is substantially limited in any activity. (Id. at 10.) Plaintiff replied by pointing out that based upon her doctor's testimony, she is substantially limited in the activities of eating and metabolizing food, and she filed a motion for leave to amend her complaint and supporting brief to address fully the activities of eating and metabolizing food. (Pl.'s Opp'n M.S.J. (ECF No. 46) at 3 (citing Bahl's Dep. (ECF No. 38-7) at 11, 13).) Grosso also argued that her impairment does substantially limit her because she must wear an insulin pump, strictly monitor her diet, and HUS can cause her to pass out but rarely does so. (Id. at 5-6.)

To allow this motion to be resolved, and as part of an agreement by which the court denied plaintiff's motion to file a second amended complaint, the parties agreed only for

---

[25] New regulations became effective on May 24, 2011, following the enactment of the ADAAA. The regulations cited within this memorandum opinion are the ones in effect at the time of plaintiff's termination.

[26] This decision was overturned by the ADAAA, but it remains good law with respect to the pre-2009 ADA.

[27] There is a lack of consistent standards when evaluating whether a person's diabetes is a covered disability within the meaning of the pre-2009ADA, and no single set of factors appears to be used. See, e.g., Wilson v. MVM, Inc., 475 F.3d 166, 171, 179 (3d Cir. 2006) (noting that the plaintiffs were unable to show that their diabetes and hearing problems were not effectively mitigated by corrective measures); Shultz v. Potter, 142 F.App'x 598, 599 (3d Cir. 2005) (holding that the plaintiff's diabetes was not a disability where the plaintiff claimed that she was substantially limited in the major life activity of eating due to having to take insulin and monitor her diet); Parker v. Port Auth. of Allegheny Cnty., 90 F. App'x 600, 603-04 (3d Cir. 2004) (citing Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999) (holding that the plaintiff's diabetic condition, which was exacerbated by stress, did not constitute a

purposes of defendants' motion for summary judgment that Grosso's diabetes and HUS qualify her as a person with a disability under the ADA.  Therefore, there is no genuine dispute of material fact concerning whether Grosso was in fact disabled under the ADA.

    2.      Qualified Individual with a Disability

In order to be protected by the ADA, a person must be considered a "qualified individual with a disability."  42 U.S.C. § 12111(8).  That term is defined as

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

Id.  The Court of Appeals for the Third Circuit has utilized a two-prong test to determine whether a person meets this definition.  Gaul, 134 F.3d at 580.  The first prong is "whether 'the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'"  Id. (quoting app. to pt. 1630 – Interpretive Guidance on Title I of the Americans with Disabilities Act, 65 Fed. Reg. 36,327 (June 8, 2000) (codified 29 C.F.R. pt. 1630, app.)).  The second inquiry is "'whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.'"  Id. (quoting 29 C.F.R. pt. 1630, app.).  Defendants do not challenge whether the Grosso meets the first prong for the purposes of this motion for summary judgment, but they do challenge the second prong.  (Defs.' M.S.J. (ECF No. 40) at 11.)  More specifically, defendants contend that even with reasonable accommodation, plaintiff cannot

---

disability because the defendant only viewed the plaintiff as unfit for the particular job of bus driving, not unfit as to all stressful jobs)).

perform the essential functions of her job.  (Id. at 14; Pl.'s Opp'n M.S.J. (ECF No. 46) at 8, 11.)[28]

Essential job functions are "those that are 'fundamental,' not 'marginal.'"  Skerski v. Time Warner Cable Co., 257 F.3d 273, 279 (3d Cir. 2001) (quoting 29 C.F.R. § 1630.2(n)(2)). That distinction is made on a case-by-case basis, Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 326 (3d Cir. 2003) (citing Deane v. Pocono Med. Ctr., 142 F.3d 138, 148 (3d Cir. 1998) (en banc)), and is a factual question for the jury, id. at 327 (citing Deane, 142 F.3d at 148).  The regulations contain a nonexhaustive list of factors to consider when identifying essential job functions including "[t]he consequences of not requiring the incumbent to perform the function," 29 C.F.R. § 1630.2(n)(3)(iv), and "[t]he current work experience of incumbents in similar jobs," id. § 16030.2(n)(3)(vii)."[29]  An employee's actual experience is also something to consider. Sherski, 257 F.3d at 281.

An employer's failure to provide reasonable accommodations is a violation of the ADA. 42 U.S.C. § 12112(b)(5)(A).  Under the ADA, providing reasonable accommodations is defined as

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations,

---

[28] There is no need to discuss whether or not Grosso could perform the essential functions of her job without reasonable accommodations because plaintiff admitted that she needs reasonable accommodation: "this disability does not interfere with her ability to perform the essential functions of her job [i]f she is reasonably accommodated." (Pl.'s Opp'n M.S.J. (ECF No. 46) at 9.)

[29] The other enumerated factors are

> (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; . . . (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents in the job . . . ."

29 C.F.R. § 1630.2(n)(3)(i)-(iii), (v)-(vi).

> training materials or policies, the provision of qualified readers or interpreters,
> and other similar accommodations for individuals with disabilities.

Id. § 12111(9).  The regulations further define reasonable accommodation as "[m]odifications or

adjustments to the work environment, or to the manner or circumstances under which the

position held or desired is customarily performed, that enable a qualified individual with a

disability to perform the essential functions of that position."  29 C.F.R. § 1630.2(o)(1)(ii).  In

determining what reasonable accommodations an employee needs, the employer may need to

engage in an "informal, interactive process" with the employee.  Conneen, 334 F.3d at 329;

Mengine v. Runyon, 114 F.3d 415, 416 (3d Cir. 1997).[30]  The plaintiff must show that the

proposed accommodation is possible.  Gaul, 134 F.3d at 579.

An employer is not required to provide reasonable accommodations if doing so would be

unreasonable, resulting in undue burden or hardship, 42 U.S.C. § 12112(b)(5)(A),[31] or if the

employee is a direct threat to the safety of others or the employee, Buskirk v. Apollo Metals, 307

F.3d 160, 168 (3d Cir. 2002).  The undue burden exception to providing reasonable

accommodations is defined as "an action requiring significant difficulty or expense."  42 U.S.C.

§ 12111(10)(A).  For this affirmative defense, the defendant has the burden of proof.  Gaul, 134

F.3d at 581 (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)).  The ADA lists factors

to evaluate when deciding whether having to provide an accommodation would rise to the level

---

[30] The United States Court of Appeals for the Third Circuit recognizes a duty to act in good faith during the
interactive process and to prove that an employer breached the standard, the employee must show that

> "1) the employer knew about the employee's disability; 2) the employee requested
> accommodations or assistance for his or her disability; 3) the employer did not make a good faith
> effort to assist the employee in seeking accommodations; and 4) the employee could have been
> reasonably accommodated but for the employer's lack of good faith."

Williams v. Phila. Hous. Auth. Police Dep't., 380 F.3d 751, 722 (3d Cir. 2004) (quoting Taylor, 184 F.3d at 319-20).

[31] Under the ADA, one form of discrimination is "not making reasonable accommodations to the known physical or
mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such

of undue burden including the "nature and cost of the accommodation needed," the "type of operation or operations" of the employer, the "overall financial resources" of the employee, and the "overall size of the business." 42 U.S.C. § 12111(10)(B)(i)-(iv).

Under the pre-2009 ADA, an employee constitutes a direct threat if he or she poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." Id. § 12111(3). The employer has the burden of showing that the employee is direct threat. EEOC v. Hussey Copper Ltd., 696 F. Supp. 2d 505, 520 (W.D. Pa. 2010). Determining whether an employee is a direct threat requires an "individualized assessment" using "reasonable medical judgment" of the employee's ability to perform his or her essential job functions. 29 C.F.R. § 1630.2(r). The regulations list four factors to consider when making the determination: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." Id. § 1630.2(r)(1)-(4). The question is not whether a risk exists, but whether the risk is significant. Doe v. County of Centre, 242 F.3d 437, 447 (3d Cir. 2001) (quoting Bragdon v. Abbott, 524 U.S. 624, 649 (1998)).

Defendants in this case provided Grosso reasonable accommodations for her diabetes and HUS before she was terminated, such as allowing her to take breaks and to send other staff members to get food for her. (Pl.'s Opp'n M.S.J. (ECF No. 46) at 11; Pl.'s Dep. (ECF No. 38-1) at 63-64.) Plaintiff was also allowed to take food from the ICU patient refrigerator. (Pl.'s Dep. (ECF No. 38-1) at 98.) Plaintiff argues she was able to perform her job with these accommodations. Plaintiff, however, contends that defendants, without undue burden, could have provided additional reasonable accommodations (Pl.'s Opp'n M.S.J. (ECF No. 46) at 12),

---

covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

but failed to do so (Am. Compl. (ECF No. 9) at 4). Those accommodations include making sure that plaintiff's co-workers were aware of her symptoms during a hypoglycemic incident so they could assist her and by letting the second, or backup, perfusionist present in the operating room take over plaintiff's responsibilities if necessary. (Id.)

The court must decide if a genuine dispute exists with respect to whether Grosso could perform her job with reasonable accommodations. Plaintiff argues: (1) she could perform the essential functions of her job with the reasonable accommodations defendants had already provided; and (2) defendants could have provided additional reasonable accommodations, without undue burden, but failed to do so. The court will consider plaintiff's arguments in the alternative: even if Grosso could not perform her job with the existent accommodations, plaintiff argues there are sufficient facts from which a jury could find that with additional accommodations, she could perform the essential functions of her job.

With respect to plaintiff's first argument, there is no genuine dispute that she was unqualified to perform the essential functions of her job with the then-existing reasonable accommodations. Defendants argue that Grosso submitted a sham affidavit that conflicts with her deposition testimony in order to create issues to preclude summary judgment.[32] (Reply Br.- Defs.' (ECF No. 53) at 2.) The depositions of plaintiff and her expert differ from her briefs in opposition to the summary judgment and her affidavit, in which she downplays her disability. The deposition testimony paints a perilous picture in which plaintiff can slip into a state of unconsciousness at any moment and without warning. (Pl.'s Dep. (ECF No. 38-1) at 51, 57, 106-07; Bahl's Dep. (ECF No. 38-7) at 29-31.) On the other hand, plaintiff's reply to defendants' contentions about the dangers of her medical condition and plaintiff's affidavit attempt to neutralize the deposition testimony by explaining that she is able to self treat and only

under rare circumstances does she become unconscious. (Pl.'s Sur Reply to Defs.' Reply Br. Supp. Defs.' Mot. Summ. J. ("Pl.'s Sur Reply") (ECF No. 56) at 4; Pl.'s Aff. Ex. 16 (ECF No. 49-32) ¶ 19.) During her deposition, Grosso stated that "at least once a month" she becomes suddenly disoriented and that since January 2008, she has suddenly lost consciousness six to seven times. (Pl.'s Dep. (ECF No. 38-1) at 105-06.) Plaintiff's affidavit, however, downplays this risk by focusing on her only having passed out nine times in her life and only due to rare circumstances, such as skipping meals and rigorous exercise. (Pl.'s Aff. Ex. 16 (ECF No. 49-32) ¶ 28.) Defendants assert this position mischaracterizes the severity of plaintiff's condition and is an attempt to "downplay" her symptoms (Reply Br.- Defs.' (ECF No. 53) at 2), but plaintiff admitted that stating she has passed out nine times in her life is not inaccurate because "[i]t is entirely consistent if Grosso has passed out nine times to date, that 6 or 7 of them could have occurred since January 2008." (Pl.'s Sur Reply (ECF No. 56) at 3.) As stated above, for purposes of this motion for summary judgment, deciding the sham affidavit issue is unnecessary because the court will enter judgment as a matter of law in favor of defendants, upon consideration of the entire record, including the affidavit in issue.

Viewing the facts in the light most favorable to plaintiff, it is clear that not every hypoglycemic incident results in her becoming unconscious, and sometimes, Grosso is able to self treat. The problem is that plaintiff has no way of determining beforehand when she might become unconsciousness and have no opportunity to self treat. Plaintiff's risk of those incidents occurring increased recently because she admitted that two-thirds of her "passing out" incidents occurred since January 2008. (Pl.'s Dep. (ECF No. 38-1.)

Plaintiff's responsibilities as a staff perfusionist were to run the cardiopulmonary bypass machine (Lucas' Dep. (ECF No. 38-6) at 15-16), which according to Pellegrini, the surgeon with

---

[32] See supra note 5.

whom Grosso worked on July 31, 2008, sustains the life of the patient during surgery (Pellegrini's Dep. (ECF No. 38-5) at 27). As the machine circulates the patient's blood during surgery, Grosso's responsibilities were to maintain the patient's blood pressure, oxygenation, body temperature (Lucas' Dep. (ECF No. 38-6) at 15-16), and administer an anti-coagulant into the patient's bloodstream (Pellegrini's Dep. (ECF No. 38-5) at 17-18). As a perfusionist, Grosso was also charged with monitoring medications given during the course of an operation, including anesthetics. (Lucas' Dep. (ECF No. 38-6) at 15-16; Pellegrini's Dep. (ECF No. 38-5) at 15.)

Pellegrini stated that "it would be malpractice" to have plaintiff run the machine and had he known of her condition, he would not have permitted her to do so. (Pellegrini's Dep. (ECF No. 38-5) at 37.) According to his medical judgment, the risks in allowing someone with plaintiff's condition are high because if a perfusionist were to become unconscious while running the machine, the patient could suffer irreparable injury or even die. (Id. at 54.)

There is no genuine dispute that the essential function of plaintiff's job as a perfusionist was to set up and operate the bypass machine, which includes administering some medications and monitoring various life signs of the patient, such as the patient's body temperature. (See Lucas' Dep. (ECF No. 38-1) at 15-16; Pellegrini's Dep. (ECF No. 38-1) at 17-18.) Looking at Grosso's deposition testimony as a whole shows that this was her only job function. Not requiring Grosso to operate the bypass machine would strip her of virtually all functions that she fulfilled while employed by defendants. See 29 C.F.R. § 1630.2(n)(3)(iv).

In this case, summary judgment is appropriate on the ADA claim both because there is no genuine dispute about the existence of unreasonable accommodations and because plaintiff would be a direct threat to defendants' patients were she allowed to continue working as a perfusionist. Plaintiff admitted that she loses consciousness without warning. (Pl.'s Dep. (ECF

No. 38-1) at 31, 51.) Her job as a perfusionist requires her to monitor a bypass machine to ensure the safety of a patient (Lucas' Dep. (ECF No. 38-6) at 15-16), whose life depends on the proper operation and function of the machine (Pellegrini's Dep. (ECF No. 38-5) at 27). No accommodation, short of assigning a second person to monitor plaintiff, would allow plaintiff to perform the functions required of a perfusionist. As discussed in more detail below, such an accommodation is unduly burdensome because it would essentially require the hiring of a second person to fulfill plaintiff's job requirements. Clearly, no reasonable jury could conclude that even with plaintiff being able to take breaks and get food when necessary or have someone else get food for her, she could perform the essential functions of her job.

With respect to the direct threat issue, no reasonable jury could conclude that plaintiff was not a direct threat to defendants' patients. Applying the four factors provided by the regulations, 29 C.F.R. § 1630.2(r)(1)-(4), the risk would exist whenever plaintiff was working; the severity of the harm would be high, including risked loss of human life; and it is fairly likely, given plaintiff's own testimony regarding the frequency with which she loses consciousness, that plaintiff would pass out at some point in the imminent future during a bypass procedure (see Pl.'s Dep. (ECF No. 38-1) at 104-06). The record demonstrates, at the very least, that Grosso already had some hypoglycemic issues with alertness while operating the bypass machine. Considering the facts of record and making reasonable inferences in favor of plaintiff, and in review of the approach taken by other courts, as set out more fully in the paragraphs below, the court concludes that no reasonable jury could find that plaintiff was not a direct threat to defendants' patients. There is no genuine dispute that to continue to employ Grosso as a perfusionist would constitute "a significant risk to the health or safety" of her patients "that [could not] be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). No *reasonable*

accommodation could mitigate the risk posed by plaintiff's employment; beyond hiring a second person to monitor plaintiff (which would be unduly burdensome), it is not possible to mitigate the risk created by Grosso performing life-maintaining functions during an open-heart surgery.

Other courts have come to the same conclusion in similar cases. In Haas v. Wyoming Valley Health Care System, 553 F. Supp. 2d 390, 402 (M.D. Pa. 2008), the district court concluded that an orthopedic surgeon with bipolar disorder was a direct threat to patient safety under the ADA and having a general surgeon supervise during the plaintiff's surgeries did not amount to a reasonable accommodation. During surgery, the plaintiff became confused due to his mental disorder and could not complete the surgery without instruction from others. Id. at 393. The success of the surgery was irrelevant to the court. Id. at 400-01.

> The fact that this particular incident did not result in harm to the patient does not establish that [the plaintiff] did not pose a direct threat to his patients. Rather, the question is whether an occurrence of such an episode could result in harm to a patient. There are numerous facts in evidence that show that such an episode could potentially occur again.

Id. at 401. Similarly, if Grosso were to become disoriented and confused, let alone unconscious, while a patient was on the machine, a patient could be harmed by her careless or negligent monitoring of the patient and machinery. Grosso stated that she changes suddenly from feeling fine to becoming disoriented at least once a month (Pl.'s Dep. (ECF No. 38-1) at 106), and her risk of passing out appears to be a more frequent occurrence (see id. at 104-07). Because plaintiff stated that there are times when she is unable to predict that an incident could lead to unconsciousness (id. at 106-07), a reasonable jury could only conclude that she could experience a serious episode while a patient is on bypass.

The Court of Appeals for the Fifth Circuit has held that a police officer with insulin-dependent diabetes posed a direct threat to others when operating firearms and driving a police

vehicle were viewed as his essential job functions.  Gonzales v. City of New Braunfels, 176 F.3d 834, 838 (5th Cir. 1999).  Other courts have held that frequency, or the likelihood of risk, is not as important of a factor in determining whether the patient is a direct threat when the potential harm is grave.  E.g., Hutton v. Elf Atochem N. Am., Inc., 273 F.3d 884 (9th Cir. 2001); Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284 (10th Cir. 2000).  With respect to diabetics suffering from hypoglycemia similar to plaintiff, other courts have held that they constituted a direct threat in the context of production plants with dangerous machinery.  See, e.g., Darnell v. Thermafiber, Inc., 417 F.3d 657 (7th Cir. 2005); Onken v. McNeilus Truck & Mfg., 639 F.Supp.2d 966 (N.D. Iowa 2009).

Even if more steps were taken to monitor plaintiff's alertness (but not reaching the level of specifically paying another person to monitor plaintiff), there is still no genuine dispute over the additional accommodations.  Some people with whom plaintiff worked already knew about her condition.  (Pl.'s Dep. (ECF No. 38-1) at 49.)  For example, Knauf, the lead perfusionist who worked with plaintiff on July 31, 2008, knew about plaintiff's medical conditions and her elective surgery.  (Id. at 127-28; Knauf's Dep. (ECF No. 38-9) at 28-29.)  Plaintiff stated that she had no outside warning signs preceding some of her hypoglycemic incidents: "Well, when I don't even know I am low glucose, I don't think [Knauf] would know.  I mean, I have no outward sign."  (Pl.'s Dep. (ECF No. 38-1) at 51.)  Even a staff that would be more aware of her condition could not help when Grosso experiences hypoglycemic episodes without any outward signs.  The staff would not always be able to recognize when Grosso was nonfunctioning.

Defendants' practice was to have a backup, or second, perfusionist available.  (Knauf's Dep. (ECF No. 38-9) at 25.)  The facts of record reflect that the second perfusionist has a somewhat flexible role in the operating room.  For example, on July 31, 2008, Knauf, assumed

the role as the backup perfusionist under Grosso.  (Id.)  Knauf was not standing behind or beside plaintiff every minute the patient was on bypass.  After the patient was on bypass, Knauf realized the patient was on a drug with which she was unfamiliar.  (Id. at 26.)  Knauf left the operating room and went into the adjacent pump room to look up the drug using a computer.  (Id.)  One of the responsibilities of a perfusionist is to monitor any medications administered to the patient during surgery.  (Pellegrini's Dep. (ECF No. 38-5) at 15; Lucas' Dep. (ECF No. 38-6) at 15-16.)  Becoming familiar with these medications is obviously important.  If the second perfusionist were required to always remain in the operating room while the patient was on bypass, Knauf would have been unable to look up the drug.  This important task could have only been accomplished if another person in the operating room could do it or if another person were added to the staff.

The problem with requiring a second perfusionist to *always* be ready to take over for the on-duty perfusionist is that such an arrangement would require defendants to have another perfusionist at all times in the operating room.  Several other courts have decided that having other personnel perform some of the functions of the disabled employee is unreasonable and not required under the ADA.  See, e.g., Murphy v. United Parcel Serv., Inc., 946 F. Supp. 872, 872, 882-83 (D.C. Kan. 1996) (holding that because driving was an essential job function of a truck mechanic required to take road service calls, the employer did not have to provide another mechanic to accompany the plaintiff mechanic, who suffered from a blood pressure disability, to drive); Guneratne v St. Mary's Hosp., 943 F. Supp. 771, 775 (S.D. Tex. 1996) (holding that a hospital did not have to provide assistance to a nurse with a back injury when heavy lifting was required); Holbrook v. City of Alpharetta, 911 F. Supp. 1524, 1536-37 (N.D. Ga. 1995) (holding a city department was not obligated to hire a second detective to accompany the plaintiff

detective who suffered from diabetic retinopathy, a severe visual impairment, to crime scenes for evidence collection); <u>Johnston v Morrison, Inc.</u>, 849 F. Supp. 777, 779 (N.D. Ala. 1994) (holding that a restaurant did not have to provide assistance from its other employees to the plaintiff food server during busy hours where the plaintiff suffered from panic attack disorder and hypoglycemia).

Because there is no genuine dispute that (1) Grosso is a direct threat to the safety of others, and (2) no reasonable accommodations exist which could mitigate the threat, no reasonable jury could conclude that Grosso is a "qualified individual with a disability" under the ADA. <u>See</u> 42 U.S.C. § 12111(8). Grosso has not adduced facts from which a reasonable jury could find that she is a "qualified individual with a disability," <u>see id.</u>, and, therefore, plaintiff failed to establish a prima facie case, <u>see</u> <u>Sulima</u>, 602 F.3d at 185 (listing the elements of a prima facie ADA discrimination claim). The court need not address the third element of an ADA claim—that plaintiff suffered an adverse employment decision as a result of defendants' discrimination against her because of her disability, <u>see id.</u> (describing the third element of an ADA claim). Consequently, it is unnecessary for the court to employ the <u>McDonnell-Douglas</u> burden-shifting framework and address whether there is sufficient evidence from which a jury could find pretext. Because no reasonable jury could conclude that plaintiff is a "qualified individual with a disability," <u>see</u> 42 U. S. C. § 12111(8), the court must grant defendants' motion for summary judgment with respect to Grosso's ADA claim.


B.      FMLA Claims

The FMLA assists families by establishing a "minimum labor standard for leave." <u>Churchill v. Star Enters.</u>, 183 F.3d 184, 192 (3d Cir. 1999). The purposes of the FMLA are

"(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity; [and] (2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse or parent who has a serious health condition."

Sommer v. Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006) (quoting 29 U.S.C. § 2601(b)(1), (2)).  Under the FMLA, eligible employees have the right to take twelve work-weeks of qualified leave during a twelve-month time period.  29 U.S.C. § 2612(a)(1).  Taking leave because of "a serious health condition that makes the employee unable to perform the functions" of his or her job is one form of qualified leave.  Id.  When the employee returns, the employee is entitled to reinstatement or reassignment to a similar position.  Id. § 2614(a)(2).  There are two types of FMLA claims: (1) interference and (2) retaliation.

       1.       FMLA Interference Claim

Under the FMLA, employers are not permitted "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided."  Id. § 2615(a)(1).  For a plaintiff employee to establish an FMLA interference claim, the employee only must "'show that he was entitled to benefits under the FMLA and that he was denied them.'"  Sommer, 461 F.3d at 399 (quoting Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)).  This type of claim does not fall within discrimination jurisprudence, and the McDonnell-Douglas burden-shifting framework is not used.  Id.  This claim only deals with whether an employee was denied a benefit under the FMLA.  Id.

This court has previously listed the elements a plaintiff is required to show in order to state a claim for interference.

A plaintiff must show that: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the

defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

Mascioli v. Arby's Rest. Grp., Inc., 610 F. Supp. 2d 419, 429-30 (W.D. Pa. 2009) (citing

Lombardo v. Air Prods. & Chems., Inc., No. 06-1120, 2006 WL 2547916, at *11 (E.D. Pa. July

7, 2006)).  The fourth element is dispositive in the instant matter.  Under 29 C.F.R. § 825.302,

employees wishing to take FMLA qualified leave must provide adequate notice to their

employers.  Although the regulations state that advance notice of thirty days is necessary when

the need for leave is foreseeable, id. § 825.302(a), "[a]n employee shall provide at least verbal

notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave,

and the anticipated timing and duration of the leave," id. at § 825.302(c).  Formal, written notice

is unnecessary, but it is well established that the employee is required to give the employer

notice.  Sarnowski v. Air Brooke Limousine, Inc., 510 F.2d 398, 401-02 (3d Cir. 2007).  Even in

cases of intermittent leave, the employee is required to "advise" the employer.  29 C.F.R. §

825.302(f).  In determining whether the employee provided adequate notice to the employer,

> [t]he critical question is how the information conveyed to the employer is reasonably interpreted. An employee who does not cite to the FMLA or provide the exact dates or duration of the leave requested nonetheless may have provided his employer with reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA.

Sarnowski, 510 F.2d at 402.

Grosso is not claiming that she was entitled to FMLA leave for her lap band surgery;

rather, she is claiming that on July 31, 2008, when, according to her, she was unable to perform

her duties because she had a hypoglycemic attack, she was on FMLA leave.  (J.S.F. – Defs.'

(ECF No. 55) ¶ 103.)  Plaintiff contends that because defendants knew enough about her diabetes

and lap band surgery, the events of July 31, 2008 constituted notice that she was seeking FMLA

leave.  (Id.)

The record contains no evidence that Grosso ever mentioned leave to her supervisors and the circumstances do not show she indicated leave to them. No reasonable jury could find that notice was given to defendants. A reasonable jury could not, therefore, find in Grosso's favor on the FMLA interference claim, given her burden of proof at trial, and the court must enter summary judgment in favor of defendants with respect to any FMLA interference claim. During the first incident on July 31, 2008, Knauf, the lead perfusionist, thought she saw plaintiff sleeping and told her to walk around and make sure that she was awake. (J.S.F. – Defs.' (ECF No. 55) ¶ 65; Knauf's Dep. (ECF No. 38-9) at 26.) Grosso left the operating room to get some food and then returned. (Pl.'s Dep. (ECF No. 38) at 79-80.) According to Grosso, one of the accommodations with which defendants provided her was being allowed to take breaks and get food. (Id. at 63-64.) Her having to leave the operating room could not be found by a reasonable jury to be out of the ordinary and, therefore, could not constitute notice to her employer that she needed FMLA leave. In the second incident on that day, Knauf asked plaintiff how she was doing, and Grosso replied "I'm fine. This is just a long case." (Knauf's Dep. (ECF No. 38-9) at 26-27.) Plaintiff's statement is directly contradictory to language that would constitute notice. Grosso admitted that she was fine. (Id.) Therefore, there is no genuine dispute of material facts that Grosso failed to state an FMLA interference claim. Defendants are entitled to summary judgment on that claim.

2.      FMLA Retaliation Claim

Under the FMLA, "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). In order to successfully establish a FMLA retaliation

claim under § 2615(a)(2), "'a plaintiff must demonstrate that: (1) he or she is protected under the FMLA, (2) he or she suffered an adverse employment action, and (3) the adverse action was causally related to the plaintiff's exercise of his or her FMLA rights.'" Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508 (3d Cir. 2009) (quoting Erdman v. Nationwide Ins. Co., 510 F. Supp. 2d 363, 370 n.4 (M.D. Pa.2007), aff'd in part, vacated in part, 582 F.3d 500 (3d Cir. 2009) (citing Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir.2004))). In an unpublished decision, the Court of Appeals for the Third Circuit repackaged the first element listed in Erdman as requiring not that the plaintiff be protected by the FMLA, but rather that he or she have "invoked his rights right to FMLA benefits." Hayduk v. City of Johnstown, 386 F. App'x 55, 59-60 (3d Cir. 2010) (citing Erdman, 582 F.3d at 509), cert. denied, 131 S. Ct. 1002 (2011). The McDonnell-Douglas burden-shifting analysis is employed for retaliation claims. Sommer, 461 F.3d at 399. "An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave . . . employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions . . . ." 29 C.F.R. § 825.220.

The first element of a FMLA retaliation claim, being protected under the FMLA, relates to whether or not an employee took leave. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). The Court of Appeals for the Third Circuit does not require that an employee actually take FMLA leave; an "invocation of FMLA rights" is sufficient. Erdman, 582 F.3d at 509. In order to invoke FMLA rights, the employee must give the employer adequate notice of his or her need for FMLA leave. Hayduk, 386 F. App'x at 60 (citing Carter v. Ford Motor Co., 121 F.3d 1146, 1148 (8th Cir. 1997)); see Scobey v. Nucor Steel-Ark., 580 F.3d 781, 786 (8th Cir. 2009) (citing Rask v. Fresenius Med. Care N. Am., 509 F.3d 466, 472 (8th

Cir. 2007) (noting that the employee's notice must enable the employer to distinguish between ordinary sick days versus leave for a serious medical reason). The regulations state that for unforeseeable FMLA leave, "an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). The regulations clarify that an employee is permitted to wait one to two days after taking FMLA leave to give the employer notice. Id.

In Grosso's responses in the joint statement of facts, she alleged (1) that the time she was unable to perform her duties on July 31, 2008 should be classified as FMLA leave, and (2) because defendants knew enough about her medical condition, the events of July 31, 2008 constituted notice to them that she was seeking FMLA protection. (J.S.F. – Defs.' (ECF No. 55) ¶ 103.) Grosso initially admitted during her deposition to never having taken FMLA leave on July 31, 2008. (Pl.'s Dep. (ECF No. 38-1) at 120.) She, however, eventually characterized the time she was unable to perform her job in the operating room on July 31, 2008 as FMLA leave. (Id. at 122-23.)

Although Grosso does not need to show that she in fact took FMLA leave in order to establish a FMLA retaliation claim, she must show that she invoked her FMLA rights. See Erdman, 582 F.3d at 509. No reasonable jury could conclude that she invoked her FMLA rights because defendants, her employers, were not given notice of the assertion of her rights. She failed to provide notice for the same reasons set forth above in the section addressing her FMLA interference claim. It was not until Grosso's deposition, far beyond the "as soon as practicable standard" set by 29 C.F.R. § 825.303(a) for unforeseeable leave, that she specifically argued the time she was unable to function on July 31, 2008 should be considered FMLA protected leave. (Pl.'s Dep. (ECF No. 38-1) at 122-23.) No reasonable jury could conclude that Grosso *invoked*

any right under the FMLA under these circumstances. The *post hoc* characterization by Grosso's counsel of her hypoglycemic incidents as FMLA leave does little more than establish that Grosso never took leave—or invoked any right to FMLA leave—in the first place.

In the alternative, defendants are also entitled to summary judgment on this FMLA retaliation claim because a reasonable jury could not determine that the third element of a retaliation claim, causation, is supported by the facts in the record. See Erdman, 582 F.3d at 508. For the same reasons that led the court to conclude that plaintiff did not provide notice to defendants, plaintiff did not show that her termination was causally related to her FMLA rights. At the time defendants made the decision to terminate Grosso, which was August 8, 2008 (Pl.'s Dep. (ECF No. 38-1) at 129-30), Grosso had not given them notice. Because they were not aware that Grosso had asserted rights under the FMLA, it could not have caused their decision to fire her. Defendants could not have used Grosso's alleged invocation of FMLA rights when making their employment decisions with respect to Grosso, and they are entitled to summary judgment on the FMLA retaliation claim.

## V.    CONCLUSION

Because there are no genuine disputes of material facts with respect to the question whether Grosso is a qualified individual with a disability under the ADA, and no reasonable jury could conclude that Grosso was not a direct threat to the safety of defendants' patients and that no reasonable accommodations exist which could mitigate the threat, defendants are entitled to judgment as a matter of law on the ADA claims as set forth above. Because no reasonable jury could conclude that plaintiff gave notice of her alleged FMLA time-off request to defendants, defendants are also entitled to judgment as a matter of law on the FMLA interference claim.

Similarly, no reasonable jury could enter a verdict in Grosso's favor on the FMLA retaliation claim because she gave no fair notice of her time-off requests, and, alternatively, because she could not prove causation. Because the same reasoning applied to determine that the court must enter judgment in favor of defendants with respect to the federal claims controls the determination of the PHRA claims, defendants are entitled to summary judgment on all PHRA claims as well.

Accordingly, for the reasons set forth in this memorandum opinion the court will grant defendants' motion for summary judgment with respect to all claims asserted by plaintiff. The court will enter judgment in favor of defendants on all counts. An appropriate order follows.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 9, 2012